A89A1294, A89A1295. MANDERSON & ASSOCIATES, INC. et al.
v. GORE; and vice versa.
(389 SE2d 251)

BIRDSONG, Judge.

Case No. A89A1294 is an appeal by Manderson & Associates et al. asserting two enumerations of error of the trial court's final order and judgment. Case No. A89A1295 is an appeal by James W. Gore, asserting six enumerations of error, of the same final order and judgment, the subsequent order correcting the final order and judgment, and of orders granting defendants' motion to dismiss jury demand and denying plaintiff's motion for summary judgment.

Lewis M. Manderson, Jr., and James W. Gore became business associates in an outdoor advertising business. Manderson, the principal owner and primary shareholder, sold the business at a profit. Gore shared in these profits, as he held company stock under a profit sharing plan. Manderson, Gore and another Manderson employee, named Hubbert, subsequently entered a new business venture to acquire interest in three other outdoor advertising businesses. Three limited

partnerships were organized to own, operate and eventually sell each of the three businesses. Manderson & Associates, Inc. (M&A) was formed to be the general partner of each of the three limited partnerships. Apparently, the parties contemplated that M&A would serve as general partner for investment limited partnerships engaged in the outdoor advertising business. Manderson, Gore, and Hubbert also purchased limited partnership interests in one of the businesses.

As they apparently intended to invest in other business ventures, the men formed a second corporation, MGH Management, Inc. (MGH). The primary business purpose of MGH was to provide management services for all limited partnerships for which M&A served as general partner.

Manderson was the president and majority stockholder of each corporation. Gore and Hubbert were employees of MGH, as M&A apparently had no employees. Gore also was an officer and director for MGH and M&A. Gore was vice-president in charge of finance and accounting; he was the top financial officer, and also was in charge of finding further business ventures.

To preserve the closely-held nature of the companies, each shareholder executed certain employment agreements and stock transfer agreements. The stock transfer agreements required each man to transfer his share back to the corporation upon termination of his employment. Each stock transfer agreement contained a formula for computation of the stock's purchase price. According to trial testimony, Manderson became concerned that Gore did not have the organization's best interests at heart. In January of 1986, two of the three outdoor advertising plants were sold and Gore had located no other ventures. In the early summer of 1986, Gore located a potential investment in a plastic jug manufacturing company. Gore then proposed, contrary to the parties' prior agreement, that he and Manderson be vested with equal ownership in the jug company. Manderson rejected this proposal. Manderson subsequently heard a rumor that Gore was planning to leave. He then asked Gore to present his plan for staying with the company, and repeated this request during subsequent meetings. On September 19, 1986, Manderson officially terminated Gore's employment with the company, in part asserting that Gore refused to provide such a plan. Gore contests this assertion, claiming that he provided a general plan to Manderson, and that he merely wanted to "slow down." Appellants demanded that Gore present his stock for sale to the company. Gore did not do so, and disputed the stock price due and owing him.

Gore subsequently brought suit asserting a breach of fiduciary duty by the majority stockholders and requesting declaratory judgment of the parties' rights and obligations under the agreements. Assuming the agreements are enforceable, which Gore contests, he seeks

the amount due under the agreements in addition to damages caused by Manderson's alleged breach of fiduciary duty. The case was tried without jury. The trial court denied Gore's fiduciary duty claim, construed paragraph 8 (A) (1) of the stock transfer agreements in a manner more favorable to Gore, and awarded pre-judgment interest to Gore.

## I. Case Nos. A89A1294 & A89A1295

1. All employment agreements and stock transfer agreements were executed in Alabama and the agreements each contained an Alabama choice of law provision. As a general principle of Georgia conflicts law, "[t]he rule of *lex loci contractus* controls all substantive matters, such as 'the *nature, construction* and *interpretation* of contracts.'" *Menendez v. Perishable Distrib.*, 254 Ga. 300, 302 (329 SE2d 149). In the absence of contrary public policy, our courts normally will enforce a contractual choice of law provision, *Carr v. Kupfer*, 250 Ga. 106 (1) (296 SE2d 560), as the parties by contract may stipulate that the laws of another jurisdiction will govern the transaction. *Wallace v. Harrison*, 166 Ga. App. 461, 463 (304 SE2d 487); see OCGA § 11-1-105.

## II. Case No. A89A1294

2. Appellants Manderson et al. assert the trial court erred by awarding pre-judgment interest where there was no tort or breach of contract and where the pre-condition to payment was not met by Gore.

The trial court, citing *C. E. Sawyer's Indus. &c. Fabricators v. Central Rigging &c. Corp.*, 653 F2d 956 (5th Cir.), found that Gore was entitled to pre-judgment interest under Alabama law. The trial court further found that fairness dictates the award, because appellants have enjoyed the appreciation and time value of the amount to which Gore was entitled for his stock since 60 days after his termination date (the date stock transfer should have been consummated under the stock transfer agreement). (The parties neither argue nor cite authority to contest the issue of nonapplicability of Alabama law to the award of pre-judgment interest. Accordingly, this issue has not been raised on appeal. Court of Appeals Rule 15 (c)).

The issues raised by this enumeration of error will be examined in light of this court's rule of appellate procedure that on appeal we must construe the evidence most strongly to support the verdict and judgment. *McLarty v. Kushner*, 173 Ga. App. 432 (1) (326 SE2d 777).

Under Alabama Code § 8-8-8, pre-judgment interest runs only on such sums as are certain *or are capable of being made certain*. See generally *Wood v. Central Bank of the South*, 435 S2d 1287 (10-12)

(CCA Ala.); *State Farm Mut. Auto. Ins. Co. v. Fox*, 541 S2d 1070 (SC Ala.). Compare *Shook &c. Co. v. Central Rigging &c. Corp.*, 684 F2d 1383 (USCA 11th Cir.) and *C. E. Sawyer's Indus. Fabricators v. Central Rigging &c. Corp.*, supra, with *Eastern Air Lines v. Atlantic Richfield Co.*, 712 F2d 1402 (TECA) and *Roe v. Baggett Transp. Co.*, 326 F2d 298 (USCA 5th Cir.). As appellant has not enumerated as error the issue of whether the pre-judgment award met the requisite degree of certainty under Alabama law, this question is not before us on appellate review. *Roberts v. Cotton States &c. Ins. Co.*, 186 Ga. App. 371, 373 (367 SE2d 272); *City of College Park v. Ga. Power Co.*, 188 Ga. App. 223 (372 SE2d 493).

. Assuming without deciding that Alabama Code § 8-8-8 requires a breach of contract as a prerequisite to the award of pre-judgment interest in cases sounding in contract (see *Miller & Co. v. McCown*, 531 S2d 888, 889 (SC Ala.); *Lapeyrouse Grain Corp. v. Tallant*, 439 S2d 105, 111 (SC Ala.); *Alabama Terminix Co. v. Howell*, 158 S2d 915 (5) (SC Ala.), we find that the record would support a determination by the trial court that appellant Manderson breached the stock transfer agreements.

Appellant Manderson further asserts that Gore also was in breach of the agreements, and that Gore failed to tender his stock as required. We disagree. Under Alabama law, "[h]e who seeks equity must do equity; and he who would put another in default for failing to comply with a contract must show that he has not breached his part of said contract, or else give an excuse for a failure to perform." *Keener v. Moslander*, 54 S 881 (1) (SC Ala.); accord *Walker v. Harris*, 179 S 213 (6) (SC Ala.). Moreover, "one who seeks equitable relief must come into court with 'clean hands' and . . . the application of this doctrine is peculiarly *within the discretion of the trial court.* [Cit.] More specifically, a party to a contract who has caused a failure of performance by the other party cannot take advantage of that failure." (Emphasis supplied.) *Dixson v. C & G Excavating*, 364 S2d 1160, 1162 (SC Ala.); see *Denver-Albuquerque &c. Transport v. Green*, 331 S2d 719 (1).

In *Health Care Mgmt. Corp. v. Rubenstein*, 540 S2d 77, 78 (CCA Ala.), the court stated: "A defendant breaches its contract and the plaintiff's right of action is complete upon the defendant's failure to do the particular thing that it agreed to do. . . . Because of the defendant's material breach of the contract, the plaintiff's future performance of the contract was excused and the plaintiff had an immediate cause of action for that breach. [Cit.] Since the plaintiff was not required to further perform under the contract, he did not breach it. . . ." We are satisfied that the record would support a conclusion that Manderson so materially breached the contract that Gore was excused from further performance thereunder, and that pre-judgment

interest was authorized under Alabama Code § 8-8-8. Appellant Manderson's arguments in support of this specific enumeration of error are without merit.

3. Appellant Manderson asserts the trial court erred by erroneously applying the "revenues provision" of the M&A stock transfer agreement (M&A Agreement) contrary to its plain meaning, in a manner inconsistent with the remainder of the agreement and in conflict with Gore's own prior construction.

The trial court properly concluded that under the operation of paragraph 8 (b) of the M&A Agreement, Gore's stock was subject to repurchase under the so-called "revenue provisions" of paragraph 8 (a). Paragraph 8 (a) (1) pertinently provides for the following formula: "Compute the sum of the revenues from the outdoor advertising business of the Limited Partnership and its wholly-owned entities as reflected in the Limited Partnership's audited financial statements for the three fiscal years *(or portions thereof) immediately* preceding the determination date or such lesser number of years that the Limited Partnership may have operated the outdoor advertising business." (Emphasis supplied.)

The trial court found as fact that Gore was terminated on September 19, 1986, and reached the legal conclusion "that the appropriate years to be considered are full fiscal year 1984, full fiscal year 1985, and the portion of the fiscal year 1986 *immediately proceding* [sic] Gore's termination." (Emphasis supplied.) We agree.

Pursuant to Alabama law, the construction of a contract is a function of the court and the issue whether an agreement is ambiguous is a question of law. *Federated Guar. Life Ins. Co. v. Dunn*, 439 S2d 1283 (2) (CA Ala.); *Terry Cove North v. Baldwin County Sewer Auth.*, 480 S2d 1171 (1) (SC Ala.). "In determining the intent expressed in a [contract], courts must look to the [contract] as a whole and to its nature, purpose, and subject matter." *Blue Cross &c. of Ala. v. Beck*, 523 S2d 121, 124 (CCA Ala.); *Federated Guar. Life*, supra at 1285 (4). "[T]he plain and clear meaning of its terms must be given effect. [Cit.] Likewise, the parties must be legally presumed to have intended what is plainly and clearly set out in the writing." *Blue Cross*, supra at 124; *Wright v. Robinson*, 468 S2d 94, 98 (SC Ala.) Once the parties reduce their agreements to writing, " 'the writing—in the absence of a mistake, fraud or ambiguity—is the sole expositor of the transaction and the intention of the parties.' " *Collins Co. v. City of Decatur*, 533 S2d 1127, 1130 (SC Ala.). Twisted meanings and unreasonable interpretation of words in a contract may not be used to create ambiguity. *ERA Commander Realty v. Harrigan*, 514 S2d 1329, 1334 (3) (SC Ala.); *Federated Guar. Life*, supra at 1285 (6). "Extrinsic evidence may be admitted to interpret a contract only if the court finds that the contract is ambiguous." *Terry Cove*, supra

at 1173 (4). "[I]f a contract remains reasonably susceptible to more than one meaning after the court applies established rules of interpretation, the contract is ambiguous, but if only one reasonable meaning clearly emerges, it is unambiguous." *Federated Guar. Life*, supra at 1285; accord *Blue Cross*, supra at 124.

Applying the above Alabama rules of contract interpretation and examining the stock transfer agreement in toto, we are satisfied that the trial court did not err in its interpretation of the "revenue provision."

Moreover, assuming arguendo that ambiguity had existed, such ambiguity could be resolved by applying pertinent Alabama rules of contract construction. Among those rules of construction aiding the courts in interpreting contracts "is the rule that an ambiguous contract is generally construed against the drafter." *ERA Commander*, supra at 1335 (7). Appellant Manderson was responsible for the drafting of this provision; thus, any ambiguity should be construed against appellants. If the provision "was intended to mean what [appellants] assert, then it could have been drafted much more narrowly." Id.

### III. Case No. A89A1295

4. Appellant Gore asserts that the trial court erred in finding that Manderson did not breach his fiduciary duties owed to Gore. Specifically appellant Gore has alleged that Manderson misused his position as majority stockholder, officer and director to terminate Gore's employment for the purpose of depriving Gore of the proceeds from the sale of the remaining limited partnership, Turner Outdoor Advertising, Ltd.

The trial court found that Gore was terminated for legitimate business reasons and that there was no bad faith or breach of fiduciary duty by Manderson. Construing the evidence most strongly to support verdict and judgment, *McLarty v. Kushner*, supra at 432 (1); see *Jefferson County Truck Growers Assn. v. Tanner*, 341 S2d 485 (7) (SC Ala.), we find sufficient evidence to support the trial court's finding of fact that Gore was terminated for legitimate business reasons. Accordingly, this finding must be sustained. OCGA § 9-11-52 (a).

The employment agreements of M&A and MGH both provide that Gore's employment could be terminated at any time by service of written notice. The stock transfer agreements of these two companies both provide that if a shareholder ceased to be employed by either M&A or MGH "for any reason whatever, either voluntary or involuntary, with or without fault of the [s]hareholder's part," the shareholder would sell and the corporation would buy all of shareholder's stock in the corporation. Applying the rules of contract interpretation discussed in Division 3 above, we find that the parties clearly in-

tended and expressly contracted inter alia for the absolute right to terminate employment, with or without due cause, upon service of written notice. We are satisfied that these provisions are not immoral or in violation of the public policy of this state within the meaning of OCGA §§ 13-8-1 and 13-8-2. Neither do we find this provision violates the public policy of Alabama, as "an employee contract at will may be terminated by either party with or without cause or justification. [Cit.] This means a *good* reason, a *wrong* reason, or *no* reason." *Hoffman-LaRoche v. Campbell*, 512 S2d 725 (1) (SC Ala.). Moreover, *no* serious claim is made that at the time the above agreements were executed any of the parties lacked equal knowledge of material facts or relatively equal bargaining power and business acumen. Compare *Baylor v. Jordan*, 445 S2d 254 (1) (Ala.). Under Alabama law, "[a]n employee at will cannot be *wrongfully* terminated unless such termination is for a reason which contravenes public policy." (Emphasis supplied.) *Harrell v. Reynolds Metal Co.*, 495 S2d 1381, 1387 (3) (SC Ala.). However, "majority stockholders owe a duty to at least act fairly to the minority interests, and the majority cannot avoid that duty merely because the action taken is legally authorized." *Burt v. Burt Boiler Works*, 360 S2d 327 (3) (Ala.). We find that by terminating Gore for legitimate business reasons, Manderson did not breach his duty to act fairly as required by *Burt*. Accordingly, the trial court did not err in finding that Manderson did not breach his fiduciary duty to Gore.

The case of *Jordan v. Duff & Phelps*, 815 F2d 429 (7th Cir.), relied upon by appellant Gore, is distinguishable from the facts of this case. In view of the above findings, we need not determine whether the parties could contractually alter the fiduciary duty of fair dealing owed by the majority stockholder of the close corporation. See generally *In the Matter of Reading Co.*, 711 F2d 509 (14) (3rd Cir.); *Coleman v. Taub*, 638 F2d 628 (3) (3rd Cir.); *Jenkins v. Haworth, Inc.*, 572 FSupp. 591 (10, 11) (W.D. Mich.).

5. Appellant Gore asserts the trial court erred in striking his demand for jury trial as to his breach of fiduciary duty claim.

Each of the four agreements (two employment agreements and two stock transfer agreements) contains the following provision: "The parties to the agreement desire to avoid the additional time and expense related to a jury trial of any disputes arising hereunder. Therefore it is mutually agreed by and between the parties hereto . . . that they shall and hereby do waive trial by jury of any claim, counterclaim, or third-party claim, including *any and all* claims of injury or damages, brought by either party against the other *arising out of or any way connected with* this agreement and the relationship which arises herefrom. The parties acknowledge and agree that this waiver is knowingly, freely and voluntarily given, is desired by both parties,

and is in the interest of both parties." (Emphasis supplied.)

The trial court concluded that the cause of action based on the fiduciary claim "arises directly out of the agreements entered into between plaintiff and defendants"; and that the jury waiver provision was not void for public policy reasons.

Appellee in essence asserts that the fiduciary claim arises out of the independent fiduciary duty owed to the minority stockholder, and does not arise from the agreements. While it is true that a fiduciary duty did exist independent of these agreements, it is also true that the fiduciary claim was based on an assertion that Gore's employment was terminated in bad faith by Manderson. As adjudication of this claim perforce requires an interpretation of the rights of termination and the rights and obligations surrounding and triggering the sale of shares upon such termination under the agreements, the fiduciary claim *directly* arises from and also is *connected with* the agreements. Interpreting the agreements in accordance with the rules of contract interpretation in Division 3 above, we are satisfied that the trial court did not err in its conclusion. In this regard, we find that the jury waiver provisions are not ambiguous, but are clear, concise and intentionally broad in scope.

We further find that the jury waiver provision did not violate the public policy of this state. See OCGA §§ 13-8-1; 13-8-2. In fact, the waiver of jury trials is statutorily recognized, although carefully controlled, under the laws of this state. OCGA § 9-11-39 (a). The trial court found that "all of the parties agreed in the contracts to a waiver of jury trial, making the waiver a *substantive* part of the contracts as opposed to a procedural issue. Therefore, the law of Alabama governs the validity of the jury trial waivers contained in the four contracts." (Emphasis supplied.) As the jury trial waiver provisions did not violate the public policy of this state, we agree that Alabama law applies. See Section I, Division 1, above.

The trial court then correctly applied the three-pronged test of *Mall, Inc. v. Robbins*, 412 S2d 1197 (Ala.) to determine whether to enforce the contractual waiver of the right to trial by jury. *Mall*, supra at 1199 (2); *Gaylord Dept. Stores v. Stephens*, 404 S2d 586, 588 (Ala.). Further, we find that the clauses and pertinent circumstances surrounding the execution of the clauses are distinguishable from the operative facts in *Gaylord* and *Mall*. In this regard, "[i]f the bargaining positions of the parties are equal, ordinarily jury waiver agreements will be upheld," provided that the claim for which jury trial is being waived "directly [relates] to and [arises] out of the terms and provisions of the overall agreement[s] containing the jury waiver provisions." *Mall*, supra at 1199 (4) and 1200 (5). We are satisfied that the waiver agreements meet this criteria, and that the trial court did not err.

6. Appellant Gore asserts that the stock transfer agreements contain accountant certification provisions which are void and unenforceable arbitration provision rendering the price formula provisions void and unenforceable such that Gore is entitled to actual value under the agreements.

Arbitration agreements are void and unenforceable as against public policy because they attempt to oust the courts of jurisdiction. *Parsons v. Ambos*, 121 Ga. 98 (1) (48 SE 696). However, *Ambos* "is applicable only when there is an agreement to arbitrate *all questions* which may arise in the execution of a contract, both as to liability and loss. [Cit.] Where the contract contains an arbitration provision relating only to such incidentals as price, value, measure, quantity, quality, classification, and *similar questions* the arbitration provisions in such contracts have been held valid." (Second emphasis supplied.) *West Point-Pepperell v. Multi-Line Indus.*, 231 Ga. 329, 331 (201 SE2d 452).

The trial court found "that the agreements are not arbitration agreements. The stock transfer agreements merely call upon the companies' accountants to apply the formula agreed upon by the parties. As such, they are not unenforceable arbitration provisions and do not attempt to oust the court of its jurisdiction." We agree. Moreover, it is well-recognized that " '[w]here the parties to a contract agree that the decision of a third person on a matter connected with the execution of a contract shall be final and conclusive, his decision is binding on the parties, as to those matters he is authorized to determine, except in the case of fraud, gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment.' " *Cumrine v. IPG, Inc.*, 186 Ga. App. 384 (3) (367 SE2d 581). We find no legitimate basis for departing from this rule.

7. Appellant Gore asserts that the trial court erred by "not concluding that M&A failed to satisfy the conditions precedent to enforcement of the M&A agreement price formula provisions and in not awarding actual value for Gore's M&A stock. Appellant in essence asserts that the requirements for timely certification by the accounting firms of the remaining limited partnership (Turner) and of M&A, and the requirement for a timely audit, were conditions precedent.

The trial court found that " '[a]ny failure of the defendants to provide an audit and certification within that sixty day period [of Gore's termination] is not a material breach of the agreement. Even though the audit and certification were not done until relatively recently, Gore has not been prejudiced in any way by this delay. Accordingly, the failure to strictly obey these provisions of the agreement does not prohibit enforcing the stock transfer agreements.' " Thus, the trial court inherently found that these provisions were not conditions precedent.

The provisions in question do not contain any of the generally recognized words normally associated with the introduction of a condition precedent. But, "[i]t is well settled that whether a provision in a contract is or is not a condition precedent is dependent not upon formal words but upon the intent of the parties, to be deduced from the entire instrument." *Cobbs v. Fred Burgos Constr. Co.*, 477 S2d 335, 338 (3) (Ala.); *Gertz v. Allen*, 376 S2d 695, 697 (2). Applying Alabama rules of contract interpretation, see Division 3, above, and the precedent of *Cobbs* and *Gertz*, we find that the questioned provisions were merely covenants and not conditions precedent. Moreover, Alabama law provides that even "[i]n cases of substantial doubt courts construe provisions in contracts as covenants rather than as conditions precedent." *Murphy v. Schuster Springs Lumber Co.*, 111 S 427, 431 (7) (Ala.).

However, it must be determined whether these covenants are dependent or independent. Under Alabama law "a dependent covenant . . . usually, in legal effect, [will] amount to a condition precedent or concurrent." Id. This question too "must be determined by the intention and meaning of the parties as it appears in the instrument, *and by . . . application of common sense to each particular case.*" (Emphasis supplied.) Id. Applying rules of contract interpretation under Alabama law (see Division 3, supra) and utilizing the *Murphy* standard, we find that the covenants are not dependent, and in any event were not intended by the parties to operate either as a condition precedent or as a concurrent condition. See generally *Cobbs v. Fred Burgos*, supra at 338 (3); *Gertz v. Allen*, supra at 697 (2); *Murphy v. Schuster Springs*, supra. Moreover, when it can be reasonably accomplished, a contract and its provisions will be construed to sustain contract validity. *Bullock County v. Sherlock*, 5 S2d 800 (3) (Ala.); compare *Grantham Transfer Co. v. Hawes*, 225 Ga. 436, 443 (169 SE2d 290).

The cases of *Moore v. Lovelace*, 413 S2d 1100 (Ala.) and *Durden v. Furniture Fair of Dothan*, 348 S2d 1375 (Ala.) involve conditions precedent and are distinguishable from this case.

Accordingly, we find that the trial court reached the correct result in ruling on these matters. It is a well-established rule of both Georgia and Alabama appellate procedure that " '[a] correct decision of a trial court will not be reversed regardless of the reasons given therefor.' " *Tony v. Pollard*, 248 Ga. 86 (1) (281 SE2d 557); *Bryant v. Moss*, 329 S2d 538 (2) (3) (Ala.).

8. Appellant asserts that the trial court erred in concluding that MGH-owned billboards are personal property rather than real property.

The trial court supported its legal conclusion by finding inter alia that the billboards can be readily moved from site to site with proper

equipment. This finding of fact is adequately supported by the trial record and will not be disturbed. OCGA § 9-11-52 (a); *Bell v. Cronic*, 248 Ga. 457 (2) (283 SE2d 476); *Moore v. Lovelace*, supra at 1103 (6).

Evidence of record reflects that MGH owned approximately 50 billboards of three different types, and some boards were bolted to concrete foundations. The superstructure of certain of the boards weighed approximately 25,000 to 30,000 pounds. The typical board is 45-50 feet high. The boards could be moved with proper equipment. Except for one or two instances, the boards were placed on land leased by the outdoor advertising limited partnerships who had leased the boards directly from MGH. The leases each contained a clause authorizing removal of the boards from the property on expiration of the lease and on certain other circumstances. When boards with concrete foundations were removed, in all instances except one when the foundation was removed, the concrete foundations were abandoned and left on the land. The boards were treated by MGH as real property for certain tax purposes and as personal property for other tax purposes.

As appellant Gore has not raised in his enumerations of error any appellate issue regarding the concrete *foundations* on which certain of these billboards were affixed, that question is not before us for review. *Roberts v. Cotton States &c. Co.*, supra at 373.

In Georgia the law governing the title and disposition of land is exclusively subject to the laws of the State where it is situated. *King v. King*, 203 Ga. 811, 817 (2) (48 SE2d 465). Likewise, "[t]he question of whether property is a part of real estate is to be determined according to the law of the jurisdiction in which the real estate is located." 36A CJS 593, Fixtures, § 1. Accordingly, the law of Georgia, and not the law of Alabama, is dispositive of the issue before us as to all billboards located on Georgia land on the determination date of the MGH stock transfer agreement. Examination of the record reveals that on the determination date certain of the billboards may have been located on land in other states, for example in Pennsylvania or South Carolina. As appellant Gore has failed to provide any citations of authority or argument to address the correctness or incorrectness of the trial court's ruling under the laws of states other than Georgia and Alabama, any appellate issue concerning such billboards is deemed abandoned. Court of Appeals Rule 15 (c) (2); *Thomas v. Carlisle*, 179 Ga. App. 315 (2) (346 SE2d 79). Further, appellate briefs do not direct this court to any place in the record where it is shown that any billboards were located in Alabama on the "determination date" of the MGH stock transfer agreements. Accordingly, the parties have no standing to complain of our determination to resolve this issue solely by applying Georgia law. "It is not the function of this court to cull the record on behalf of a party. . . ." *Armech Svc. Co. v. Rose*

*Elec. Co.*, 192 Ga. App. 829, 830 (386 SE2d 709) (1989).

Under Georgia law various factors should be considered in determining whether an article of personalty has become a part of the real property to which it has been actually or constructively annexed. "Varying weight, according to the circumstances of the case, may be given to the determinative factors." 36A CJS 592, supra at § 1. " ' "Whether an article of personalty connected with or attached to realty becomes a part of the realty, and therefore such a fixture that it can not be removed therefrom, depends upon the circumstances under which the article was placed upon the realty, the uses to which it is adapted, and the parties who are at issue as to whether such an article is realty or detachable personalty." ' " *Aquafine Corp. v. Fendig &c. Advertising Co.*, 155 Ga. App. 661 (1) (272 SE2d 526); *State of Ga. v. Dyson*, 89 Ga. App. 791, 793 (81 SE2d 217); *Consolidated Warehouse Co. v. Smith*, 55 Ga. App. 216 (1) (a) (189 SE 724). There must be some form of active or constructive annexation of personalty to the realty for the chattel to become a part of the realty. *State of Ga. v. Dyson*, supra at 793; 12 EGL, Fixtures, § 4. Moreover, some cases have required that there be unity of title as a prerequisite for the creation of a fixture. See, e.g., *State of Ga. v. Dyson*, supra at 793. Inherently included within these factors is that of *intent* of the parties.

It is the *intent* of the parties vested with ownership and use of the chattel to be annexed "as to whether the chattel is to become a permanent part of the realty" which is the *primary* test "in determining whether or not it becomes a fixture." 12 EGL, Fixtures, § 3; see generally, 36A CJS, Fixtures, § 2 a; see *Pease &c. Realty Trust v. Gaines*, 160 Ga. App. 125, 129 (2) (a) (286 SE2d 448). In certain circumstances, *intent* can be the controlling factor. In *Sawyer v. Foremost Dairy Prods.*, 176 Ga. 854, 861 (169 SE 115), the court held "[i]t seems to be well settled that whether fixtures have become attached to the realty as a part thereof, and not merely for incidental, transitory use, depends upon the intention of the parties vested with the ownership or use thereof." Id.; accord *Aquafine Corp. v. Fendig &c. Advertising Co.*, supra at (1).

" 'Where it is doubtful, under all the circumstances, whether the article in question is personalty or is a fixture, the doubt is to be solved by the [factfinder].' " *Aquafine Corp.*, supra at 661. Normally, the question of intent is for the factfinder. *Smith v. Odom*, 63 Ga. 499, 503 (2); *Pease &c.*, supra at 129; Ga. Real Estate Law, Fixtures, § 10-12.

Considering all relevant factors, in light of the operative circumstances, we are satisfied that the billboards are personalty rather than real property under Georgia law.

Appellant Gore asserts that the trial court erred in relying upon

the unity of title requirement (see *State of Ga. v. Dyson,* supra), MGH's tax treatment of the structures, and certain ground lease provisions which designated structures as trade fixtures. Regarding unity of title, one noted authority has found the rule to be "vague" and "seldom applied in practice." Ga. Real Estate Law, supra at § 10-7. We need not resolve these questions, however, as the trial court's ruling was correct, and accordingly will not be reversed notwithstanding the reasons therefore given. *Tony v. Pollard,* supra at 86 (1).

9. Appellant Gore, citing OCGA § 13-6-11, asserts the trial court erred in finding that "under the circumstances of this case, Gore is not entitled to an award of attorney's fees." Inherent in this finding are findings of fact that M&A was not stubbornly litigious or caused unnecessary expense to Gore.

Regarding allegations of stubborn litigiousness and unnecessary expense, mere refusal to pay a disputed claim without suit is not sufficient to support an award of attorney fees. *Typo-Repro Svcs. v. Bishop,* 188 Ga. App. 576, 580 (373 SE2d 758). Recovery of attorney fees for stubborn litigiousness and unnecessary expense is not authorized where there is a bona fide controversy. *Typo-Repro,* supra at 580; *Jeff Goolsby Homes Corp. v. Smith,* 168 Ga. App. 218, 221 (308 SE2d 564). Questions of bad faith, stubborn litigiousness, and unnecessary expense, under OCGA § 13-6-11, are generally questions for the factfinder. *Gorin v. FPA 2, P.C.,* 184 Ga. App. 239, 241 (361 SE2d 193). It was for the factfinder to determine whether there was a bona fide controversy in this case. *Jackson v. Brinegar, Inc.,* 165 Ga. App. 432, 437 (301 SE2d 493). When the trial court makes findings, express or implied, in a bench trial "[t]hese findings of fact and conclusions of law meet the requirements set forth in [OCGA § 9-11-52 (a)] (CPA Rule 52 (a))." *Derrickson v. Kristal,* 148 Ga. App. 320 (2) (251 SE2d 170). The trial court's finding that Gore was not entitled to attorney fees, under OCGA § 13-6-11, and the findings of fact inherently contained therein, are not clearly erroneous. Thus, the trial court did not err. OCGA § 9-11-52 (a).

*Judgment affirmed. Deen, P. J., and Benham, J., concur.*

DECIDED NOVEMBER 17, 1989 —
REHEARING DENIED NOVEMBER 30, 1989 —

*Arnall, Golden & Gregory, Charles L. Gregory, Karen S. Riddell,* for appellants.

*Alston & Bird, Oscar N. Persons, Walter G. Elliott II,* for appellee.